UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

ANDREA R. CLARKE,

                    Plaintiff,

    - against -

PACIFICA FOUNDATION, WBAI New York Radio
Station 99.5 FM, and ROBERT SCOTT ADAMS,

                    Defendants.

-------------------------------------------------------------------X

**MEMORANDUM
and O R D E R**

07 CV 4605 (FB)

On November 2, 2007, plaintiff Andrea R. Clarke filed this action against defendants

Pacifica Foundation ("Pacifica"), New York radio station WBAI 99.5 FM ("WBAI"), and Robert

Scott Adams, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000

*et seq.*, the New York State Human Rights Law ("NYSHRL"), New York Executive Law § 296,

and the New York City Human Rights Law ("NYCHRL"), New York City Civil Rights Law

§40(c). Following the close of discovery, Pacifica filed a motion for summary judgment[1] on

November 17, 2010, and plaintiff filed her memorandum in opposition on December 17, 2010.

Pacifica filed a reply on December 20, 2010.

After considering the parties' submissions, defendant's motion for summary judgment is

granted in part and denied in part.[2]

---

[1]The motion, filed on November 17, 2010, is filed on behalf of only Pacifica, and does
not seek judgment on behalf of defendants WBAI or Adams.

[2]On March 30, 2010, the parties consented to have the undersigned decide the motion.

Defendant Pacifica, a corporation registered to do business in New York, owns and operates WBAI 99.5 FM. (Def.'s 56.1 Stmnt[4] ¶¶ 2, 3; Compl.[5] ¶¶ 2, 3; Ans.[6] ¶ 1). WBAI is a "not-for-profit, non-commercial, listener-sponsored, frequency modulated (otherwise called "FM") radio station, which solicits listeners to become paid members." (Def.'s 56.1 Stmnt ¶ 7 Compl. ¶ 12; Ans. ¶ 6). Plaintiff alleges that she began working for Pacifica in 1990, where she was employed for one year as an unpaid volunteer, co-hosting and serving as an engineer for "Ghosts in the Machine," a show broadcast by WBAI. (Compl. ¶ 14; see Def.'s 56.1 Stmnt ¶ 9 (stating that the show was "a 2 hour show about women in music" that was broadcast on Friday mornings). Plaintiff later returned to WBAI on February 24, 1999, where she created and produced a prime time weekly 2 hour music program, named "Sister from Another Planet." (Def.'s 56.1 Stmnt ¶ 10; Compl. ¶ 15; Ans. ¶ 9). Plaintiff alleges that she continued to be

---

[3]Defendant Pacifica has submitted a Local Civil Rule 56.1 Statement of Uncontested Material Facts that cites to allegations in the Complaint that were admitted in the Answer. In addition, the defendant has submitted several affidavits to support other facts which the defendant claims are not in dispute. While the facts stated in these supporting affidavits are not incorporated in the Rule 56.1 Statement and therefore technically, defendant is not in compliance with the Local Rule (see discussion infra at 13-15), the plaintiff also has failed to comply with the Local Rule because she has not filed any response to the defendant's Rule 56.1 Statement. Courts have held that where a party fails to comply with the Local Rules, the court has discretion either to deny the motion in its entirety or to examine the record in determining whether to grant summary judgment. In this case, the Court has examined the record in an effort to determine whether the parties have met their respective burdens on this motion.

[4]Citations to "Def.'s 56.1 Stmnt" refer to the defendant's Local Civil Rule 56.1 Statement of Uncontested Material Facts, filed November 17, 2010.

[5]Citations to "Compl." refer to the Complaint, which was filed on November 2, 2007.

[6]Citations to "Ans." refer to the Answer, which was filed on December 4, 2007.

employed by Pacifica until December 25, 2006. (Compl. ¶ 16).

During the time of her employment, WBAI held "membership drives" either three or four times each year, and during these "membership drives," "WBAI offered items of value as inducements, called 'premiums' for donations, for new or sustaining members." (Def.'s 56.1 Stmnt ¶¶ 7-8; Compl. ¶ 13). Plaintiff alleges that these offers resulted in "many complaints about non-receipt of premiums[,] and a designated position was created in 2006 to address the number of complaints, in addition to help process the orders." (Def.'s 56.1 Stmnt ¶ 8; Compl. ¶¶ 12-13; Ans. ¶¶ 6-7). Plaintiff claims that between May 2006 and December 25, 2006, she was employed in a part-time position to process listener complaints. (Compl. ¶¶ 16-17).

On November 6, 2006, Pacifica hired defendant Adams as Interim General Manager of WBAI. (Def.'s 56.1 Stmnt ¶¶ 4, 5; Compl. ¶¶ 2-5; Ans. ¶ 1). Adams served in that position up to and including the filing of the Complaint. (Def.'s 56.1 Stmnt ¶ 5; Compl. ¶ 5). Plaintiff alleges that Gregory Guma, then the Executive Director of Pacifica and "a local station advisory board member," "strongly urged" the hiring of Adams to an Interim General Manager position. (Compl. ¶ 18; see Def.'s 56.1 Stmnt ¶ 15). Plaintiff claims, and defendant denies, that at the time Adams was hired, Guma was aware that Adams "published erotic short stories, an erotic blog and other pornographic material;" Guma was also allegedly aware that Adams had a reputation which "included arrogance, flippancy, impatience, drug and alcohol abuse, inordinate promiscuity and also coercion of his female listeners into sexual relationships at his former radio jobs." (Compl. ¶¶ 22-23; Ans. ¶ 14). Defendant does admit that Guma knew or should have known that there were female subordinates working under Adams as the Interim General Manager. (Def.'s 56.1 Stmnt ¶ 13).

Prior to his hiring, Adams visited WBAI on October 13, 2006, and on that date met with plaintiff and two other employees. (Def.'s 56.1 Stmnt ¶ 15; Compl. ¶ 26; Ans. ¶ 17). Plaintiff alleges that at the end of this meeting, Adams approached her and asked if she would consider serving as his assistant, and in so asking, "squeezed Plaintiff's shoulder and told her, 'Consider it and let me know.'" (Compl. ¶ 27). Plaintiff states that she accepted the offer by email the next day, but Pacifica denies this allegation. (Compl. ¶ 28; Ans. ¶ 18).

At the time Adams was hired to serve as Interim General Manager at WBAI, Adams entered into "a written, one year, employment contract" with Pacifica, beginning on November 6, 2006. (Def.'s 56.1 Stmnt ¶ 15; Compl. ¶ 29; Ans. ¶ 19). Plaintiff claims that Adams "immediately confided to me that he was sent by Pacifica to clean house, running down a checklist of names." (Pl.'s Aff.[7] ¶ 3; see Andino-Rosa Aff.[8] at 1). Plaintiff alleges, and defendant denies, that on November 6, 2006,[9] Adams "strongly urged plaintiff to schedule and conducted a private meeting with plaintiff at five o'clock that afternoon, in his office at WBAI[,] which lasted 45 minutes." (Compl. ¶ 30; Ans. ¶ 20). At the meeting, Adams informed plaintiff that there was no money in the budget to pay her as his assistant. (Def.'s 56.1 Stmnt ¶ 16; Compl. ¶ 31; Ans. ¶ 21; Pl.'s Aff. ¶ 6). However, according to plaintiff, Adams assured her that although there was no money to hire her as his personal assistant, he "promised to make it happen." (Pl.'s

---

[7]Citations to "Pl.'s Aff." refer to Plaintiff's Affidavit in Opposition, which was filed on December 7, 2010.

[8]Citations to "Andino-Rosa Aff." refer to the Affidavit submitted by Evelyn Andino-Rosa on December 7, 2010.

[9]Although plaintiff states that this event occurred in 2007, this appears to be a typographical error. Instead, based on the chronology of events, it appears that the date should read "November 6, 2006."

Aff. ¶ 6). Adams "very adroitly and casually said to her: 'I am hopelessly attracted to you.'"
(Pl.'s Aff. ¶ 6; Compl. ¶ 31; Ans. ¶ 21). Plaintiff states that she "was horrified" and told Adams
"that she did not feel as he felt[,] but was interested only in the position that he offered her."
(Compl. ¶ 32; see Pl.'s Aff. ¶ 7 ("I immediately informed Adams that I had no interest in
becoming sexually involved with him. . .")). She claims that "it became clear that his assurance
was under the condition that I become involved in a sexual relationship with him." (Pl.'s Aff. ¶
6).

Plaintiff further alleges and defendant concedes that later that night, at about 9:00 p.m.,
Adams telephoned her. (Def.'s 56.1 Stmnt ¶ 18; Compl. ¶ 34; Ans. ¶ 21). Plaintiff claims that
although he "fail[ed] to make any mention of plaintiff's job status," he did "continu[e] about his
attraction to her and remarked: 'I have a lot more to lose than you.'" (Compl. ¶ 34; Pl.'s Aff. ¶
7). She further alleges that Adams told her "that he had told his friends about plaintiff and they
had warned him 'not to do it; (he was) nuts to risk his job,' but that notwithstanding [these
warnings] he was willing to 'throw caution to the wind.'" (Compl. ¶ 34). Plaintiff alleges that
Adams "told plaintiff that, when he first saw her, he 'got a hard-on;' that he was not 'usually a
breast man, but loved (hers),'" to which plaintiff "unambiguously retorted that she did not wish
to have a sexual relationship with him." (Id. ¶ 35). However, according to plaintiff, Adams
insisted she write down "his hotel room number, his Washington, DC and New York City cell
phone numbers and Washington, DC home telephone numbers . . . ." (Id. ¶ 36). Plaintiff states,
and defendant denies, that "[o]ver the next several days, Adams pursued . . . [her] relentlessly"
(id. ¶ 37), and that he "offered, as a further inducement, to provide her employee benefits." (Id.)
Plaintiff alleges that Adams spoke to her regarding the "employees whom he intended to fire; but

assured plaintiff that she would not be one of them." (Id. ¶ 38).

At some point after November 6, 2006, plaintiff alleges, and defendant denies, that she observed a WBAI female receptionist reading "a pornographic anthology, to which Adams had contributed." (Id. ¶ 39). Adams admitted to her that he frequently gave his pornographic books to "'any woman' who worked with him or for him." (Id. ¶¶ 39-40; Ans. ¶¶ 26-27). At work on November 15, 2006, plaintiff alleges, and defendant denies, that Adams invited her to "his hotel room at the Best Western Seaport Inn, at 33 Pike Slip, Lower Manhattan." (Compl. ¶ 41; Ans. ¶ 27). Plaintiff states that although she "reminded Adams she did not want to engage in any sexual activity with him," he "maintained that he still expected her to show up" (Compl. ¶ 41), and she feared "dismissal from her employment." (Id. ¶ 42). In her affidavit, plaintiff claims that she "reiterated that [she] did not want to have sexual intercourse with him and he promised to respect my wishes." (Pl.'s Aff. ¶ 9).

Shortly after plaintiff arrived at the hotel, plaintiff alleges, and defendant denies, that Adams "initiated oral and coital sexual activity with her" without protection, as Adams told her that "he 'never used condoms.'" (Compl. ¶ 42; Ans. ¶ 27). In her affidavit, plaintiff claims that she "was afraid of his wrath and inflated sense of power, which he displayed constantly." (Pl.'s Aff. ¶ 7). She claims that Adams "violated [her] physically and emotionally," that he "easily ripped off my clothing and proceeded to start intercourse." (Id. ¶ 8). Although she states that she communicated to him "in clear, direct, unambiguous terms" that she did not want to have sex with him, she states that "Adams forced me to have unprotected sex with him." (Id.) She also claims that he forced her to perform oral sex on him, by "pull[ing] [her] head to a position where he could achieve his objective." (Id.)

6

According to plaintiff, Adams "conceitedly ranted" about the "numerous women" with whom he regularly slept, including "a married woman from Las Vegas, with whom he 'had an affair for over twenty years.'" (Compl. ¶ 42). Plaintiff states that Adams "bragged . . . he had been blessed, so far, in not having contracted AIDS, and opined that plaintiff should accept it as well, 'Case closed. End of discussion.'" (Id.; Pl.'s Aff. ¶ 8). Plaintiff asserts that before she left the hotel room, Adams confessed "to being an alcoholic and regular cocaine user, but that his partaking 'less than once a week isn't so bad, now.'" (Compl. ¶ 43). Plaintiff claims that Adams "flagrantly abused his authority over her . . . betrayed and humiliated her, and made her feel dirty and destroyed." (Id. ¶ 44).

Around noon on November 17, 2006, plaintiff claims that she "asked Adams to stop his advances." (Compl. ¶ 45). However, when Adams asked "her [to] travel with him to Pennsylvania Station . . . where he would be taking Amtrak," she complied even though she protested that "Adams was unfairly causing" her co-workers to have to cover her estimated three-hour absence. (Id. ¶¶ 46, 47). Plaintiff asserts that Adams "angrily responded" to her protests and that Adams said he wanted to persuade plaintiff to stay in the relationship before he left on his trip. (Compl. ¶ 47; Ans. ¶ 27). Plaintiff claims that Adams also told her that "'he was sincere and was willing to risk everything for the relationship.'" (Compl. ¶ 47).

At some time during the week beginning November 15, 2006, plaintiff states that she consulted her gynecologist because "she had developed a yeast infection" even though she "had been abstinate [sic] for the immediately proceeding [sic] year and, in that time, she had no such infection" nor a history of one. (Id. ¶ 48). Plaintiff alleges that her gynecologist "concluded Adams was probably the cause of the infection." (Id.)

On or about November 23, 2006, plaintiff alleges that it was rumored in the workplace that "Adams and the WBAI receptionist were involved in a tryst . . . ." (Id. ¶ 49). Plaintiff claims that when two of his subordinates "asked Adams if the rumor was factual," he said, "'I'll fire you and everyone here if I have to.'" (Compl. ¶ 49; Ans. ¶ 29). On the same date, plaintiff states, and defendant denies, that Adams "mockingly confided" to her and "laughed derisively" that "Yolanda Thomas, the PACIFICA Human Resources Director, was on an unscheduled, emergent [sic], private, harassment training for Adams only." (Compl. ¶ 50; Ans. ¶ 30).

On or about November 26, 2006, plaintiff alleges, and defendant admits, that Adams asked plaintiff, "'Is Greene and Bedford Avenue near where you live?'" (Compl. ¶ 51; Ans. ¶ 31). Plaintiff responded affirmatively. (Id.; Ans. ¶ 31). Plaintiff states, and defendant admits, that Adams "told plaintiff that he had inspected an apartment at that location," which plaintiff claims he told her "he intended to rent." (Compl. ¶ 51). Plaintiff alleges, and defendant denies, that Adams, unable to find a hotel room, "suggested that it would be convenient for him to stay with plaintiff until he obtained the apartment." (Id.; Ans. ¶ 31). According to plaintiff, she "submitted and let him stay." (Pl.'s 56.1 Stmnt ¶ 12). Adams "showed his gratitude" after she consented by "attempting to inveigle her to read" his pornographic writings in her home. (Compl. ¶ 51). Plaintiff alleges that when she did "not succumb to Adams' effort" he relented, "to her surprise," and said, "'I am sorry if I hurt you.'" (Id.; Pl.'s Aff. ¶ 12).

Plaintiff alleges that on November 30, 2006, "plaintiff's supervisor informed her that, henceforth, her work hours would be reduced by half, ergo, her pay would be cut in half." (Compl. ¶ 52; Ans. ¶ 32). Although the Complaint does not identify plaintiff's supervisor by name, plaintiff's Affidavit states that Evelyn Andino-Rosa was her immediate supervisor. (Pl.'s

Aff. ¶ 6). Ms. Andino-Rosa has submitted a sworn statement, dated December 6, 2010, explaining that she supervised plaintiff in connection with her per diem work in the Premiums Department. (Andino-Rosa Aff. ¶ 4). Plaintiff claims that Adams denied he "had known anything about [the reduction in her hours], but would look into it." (Compl. ¶ 52).

On December 6, 2006, plaintiff alleges, and defendant denies, that "plaintiff called Adams for the last of several times about her employment status." (Compl. ¶ 53; Ans. ¶ 33). Plaintiff asserts that Adams told her he could do nothing about it and hung up (Compl. ¶ 53); however, when plaintiff immediately called him back, Adams "screamed: 'It is out of my hands! I have nothing more to say to you!'" (Id. ¶ 54). According to plaintiff, Adams suggested "it would be a good idea for plaintiff not to be on WBAI's premises during the day anyway," and "finally Adams yelled, 'And don't even think about filing a sexual harassment charge against me because I've already consulted my lawyer before I slept with you and he said I was safe, as long as you came to me.'" (Id.)

According to plaintiff, she tried to appease Adams because she was "in fear of further retribution," but Adams "curtly proposed that they discuss the matter at either her or his new apartment." (Compl. ¶ 55). Plaintiff chose his apartment because she thought Adams "would view that choice as her further relenting and not exclude her from hosting and producing her prime time program, Sister from Another Planet, as well." (Compl. ¶ 55; Ans. ¶ 33). Nevertheless, plaintiff claims that the reduction in her earnings that resulted from the cut in her hours compromised her "ability to meet her budget and, therefore, she immediately began to seek other gainful employment." (Compl. ¶ 56). Plaintiff alleges, and defendant denies, that, in addition to a loss in earnings, defendant's sexual harassment caused plaintiff to "develop

9

physical and psychological ailments, that she had never suffered before, such as: a sexual[ly] transmitted disease, high blood pressure, diminished self-worth, depression, nightmares and tarnished reputation." (Compl. ¶ 57; Ans. ¶ 33).

Defendant has submitted the Declaration of Indra Hardat, Director of the Fiscal Department for WBAI, who states that in 2007, she was the only person at WBAI who had "the power to determine the number of hours part-time employees at WBAI could work." (Hardat Decl.[10] ¶ 3). She states that in late January 2007, she was unable to give any "additional" hours to her part-time workers due to budgetary problems. (Id.) She states that "[a]ny increase or reduction in hours for Andrea Clarke was solely my prerogative, and was not and could not be done by Robert Scott Adams for any purpose." (Id. ¶ 4).

Defendant also submitted the Declaration of Ahmad Anderson, Human Resource Director for the defendant Pacifica. (Anderson Decl.[11] ¶ 1). Although he became Director of Human Resources in April 2009, he represents that plaintiff was employed by WBAI "on a part-time as needed basis to process complaints in the membership office, as a board-operator, to record 'tallys' regarding pledge donations during quarterly fund drives." (Id. ¶ 2). According to Mr. Anderson, plaintiff's hours ranged from 10 to 30 hours per week at an hourly rate of $18.46 "'as needed'" depending on the budget and the results of the WBAI fund drives. (Id.)

Mr. Anderson states that although a background check was performed on Adams prior to his hiring, which did not reveal any prior sexual harassment complaints, Pacifica did not conduct

---

[10]Citations to "Hardat Decl." refer to the Declaration in Support of Indra Hardat, dated November 10, 2010.

[11]Citations to "Anderson Decl." refer to the Declaration of Ahmad Anderson, dated November 8, 2010.

any internet research which was not standard at the time in the industry. (Id. ¶ 3). According to Mr. Anderson, Adams was provided with the Pacifica Code of Conduct which contained the sexual harassment policy and he completed the training from Human Resource Director Yolanda Thomas on December 14, 2006. (Id.)

Pacifica acknowledges receiving Ms. Clarke's letter complaint alleging sexual harassment around January 11, 2007, noting that she complained that she went to Adams' hotel room where the sexual encounter occurred, "claiming that she did so out of fear of reprisal from her new boss." (Id. ¶ 4). Pursuant to Pacifica's policies, "a full investigation was conducted" by Yolanda Thomas and Greg Guma, Executive Director of Pacifica, "immediately upon receipt of the plaintiff's letter complaint of January 11, 2007." (Id.) During the investigation, both Adams and plaintiff were interviewed. According to Anderson, the investigation revealed that "Clarke never claimed in her interview that she was forced to go to Adams' hotel room, but merely that she felt that she had to comply." (Id. ¶ 5). Anderson further noted that the investigation revealed that plaintiff's only claim as to hostility in the workplace was based on Adams' suggestion that it would be a good idea if she did not come into the station while he was there. (Id. ¶ 6). Anderson claimed that beginning in or around Christmas 2006, Ms. Clarke took a voluntary leave of absence, returning 8 weeks later, only to work evenings with no interaction with Adams. (Id.) Following the completion of its investigation, Pacifica concluded that no hostile work environment existed.

Anderson confirmed that "the power to hire or fire employees is not the sole responsibility of an Interim General Manager." (Id. ¶ 7). Instead, Anderson stated that the "power to hire and fire employees must be made only with the advice and approval of the Human

11

Resource Director . . . ." (Id.) According to Anderson, the decision to reduce plaintiff's hours was the job responsibility of Ms. Hardat and depended on the budgetary needs of the Premiums Department. (Id. ¶ 9).

DISCUSSION

A. Summary Judgment

1. Legal Standard

It is well-settled that a party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir. 1990). Since summary judgment is an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury, see Egelston v. State Univ. College at Geneseo, 535 F.2d 752, 754 (2d Cir. 1976); Gibralter v. City of New York, 612 F. Supp. 125, 133-34 (E.D.N.Y. 1985), the court should not grant summary judgment unless it is clear that all of the elements have been satisfied. See Auletta v. Tully, 576 F. Supp. 191, 194 (N.D.N.Y. 1983), aff'd, 732 F.2d 142 (2d Cir. 1984). In addition, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).

Once the moving party discharges its burden of proof under Rule 56(c), the party opposing summary judgment "has the burden of coming forward with 'specific facts showing that there is a genuine issue for trial.'" Phillips v. Kidder, Peabody & Co., 782 F. Supp. 854, 858

(S.D.N.Y. 1991) (quoting Fed. R. Civ. P. 56(e)). Rule 56(e) "provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading." Anderson v. Liberty Lobby, Inc., 477 U.S. at 256. Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. Id. at 247-48 (emphasis in original). "A defendant may move for summary judgment on the ground that the plaintiff has failed to adduce any evidence of an element of plaintiff's claim, and if the plaintiff fails in response to contest this assertion or adduce such evidence, defendant, without more, will prevail." Giannullo v. City of New York, 322 F.3d 139, 141 n.2 (2d Cir. 2003).

In reversing a grant of summary judgment, the Second Circuit noted that the "[t]rial court's task at the summary judgment motion state of litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." Quaratino v. Tiffany & Co., 71 F.3d 58, 65 (2d Cir. 1995) (quoting Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994)).


2. Non-Compliance with Local Rule 56.1

As an initial matter, both parties have failed to comply with Local Rule 56.1, either by failing to file a properly supported Statement of Undisputed Facts, or by failing to file such a statement altogether.

Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for summary judgment to submit "a separate, short and concise statement, in numbered paragraphs, of the

13

material facts as to which the moving party contends there is no genuine issue to be tried." Local Rule 56.1(a) (emphasis omitted); see also Giannullo v. City of New York, 322 F.3d at 140; Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 72 (2d Cir. 2001). The Rule further requires that the statement of undisputed facts contain citations to admissible evidence supporting each asserted material fact. Local Rule 56.1(d); see Giannullo v. City of New York, 322 F.3d at 143 (reversing the district court's grant of summary judgment because there was insufficient evidence in the record to support certain critical assertions in the moving party's statement of material facts); see also Watt v. New York Botanical Garden, No. 98 CV 1095, 2000 WL 193626, at *1 n.1 (S.D.N.Y. Feb. 16, 2000).

The party opposing a motion for summary judgment is required to submit a counter-statement controverting the moving party's statement of material facts, indicating which facts are in dispute that would require a trial. Local Rule 56.1(b). Under the Local Rule, "[e]ach numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for the purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." Local Rule 56.1(c). Where the party opposing a motion for summary judgment fails to submit a proper counter-statement of material facts, courts have deemed the moving party's statement of facts to be admitted and have granted summary judgment in favor of the moving party on the basis of the uncontroverted facts. See, e.g., Millus v. D'Angelo, 224 F.3d 137, 138 (2d Cir. 2000) (affirming grant of summary judgment based on plaintiff's failure to submit a statement pursuant to Rule 56.1); Sawyer v. Wight, 196 F. Supp. 2d 220, 225 (E.D.N.Y. 2002) (noting that "[t]he Second Circuit permits District Courts to grant

14

summary judgment to moving parties on the basis of their uncontroverted 56.1 Statements").

District courts are given "broad discretion to determine whether to overlook a party's failure to comply with the local court rules." Holtz v. Rockefeller & Co., Inc., 258 F.3d at 73; Healthfirst, Inc. v. Medco Health Solutions, Inc., No. 03 CV 5164, 2006 WL 3711567, at *5 (S.D.N.Y. Dec. 16, 2006). Where parties fail to file Rule 56.1 statements, the court may choose to accept all factual allegations of the opposing parties as true for the purposes of deciding the motion for summary judgment, or may alternately "opt to conduct an assiduous review of the record." Id. (internal quotations and citations omitted); see also Sawyer v. Wight, 196 F. Supp. 2d at 225 (noting that where Rule 56.1 has not been properly followed, courts "may discretionarily choose to search the record of their own accord") (citations omitted).

In this case, Pacifica submitted a Statement of Uncontested Facts but failed to provide citations to any admissible evidence, relying largely on assertions in the Complaint that are deemed not contested. Pacifica also did not include in the 56.1 Statement certain assertions contained in its supporting affidavits, thereby violating Local Rule 56.1(d). However, plaintiff's counsel completely failed to file a responsive Rule 56.1 Statement, instead submitting a Memorandum of Law in Opposition which includes nearly five pages of facts unsubstantiated by citations to affidavits, deposition transcripts, or documentary evidence. Worse, counsel for plaintiff was made aware of the lack of a 56.1 counter-statement by Pacifica's Reply Memorandum (see Reply at 2-3) but, nevertheless, still has not submitted a request to file a statement pursuant to Rule 56.1. Since neither party has technically complied with Local Rule 56.1, the Court must therefore search the record to determine if legitimate factual disputes remain.

B. Plaintiff's Title VII Claims

Plaintiff brings sex discrimination claims[12] against Pacifica under theories of both quid pro quo sexual harassment and hostile work environment.

Title VII of the Civil Rights Act of 1964 provides that:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of his employment, because of such individual's . . . sex . . . ; or to limit, segregate, or classify his employees or applicants in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex.

42 U.S.C. § 2000e-2(a). "Although the terms 'quid pro quo' and 'hostile work environment' do not appear in the text of Title VII, they are useful to distinguish between 'cases involving a threat which is carried out and offensive conduct in general.'" Mormol v. Costco Wholesale Corp., 364 F.3d 54, 57 (2d Cir. 2004) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998)). "'When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title

---

[12]Plaintiff brings these claims pursuant to Title VII, the New York State Human Rights Law ("NYSHRL"), and the New York City Human Rights Law ("NYCHRL"). "Discrimination and retaliation claims brought under the NYSHRL are evaluated identically to claims brought under Title VII." Hunter v. Police Athletic League, Inc., No. 09 Civ. 997, 2011 WL 1203065, at *10 (S.D.N.Y. Mar. 23, 2011) (citing Ferraro v. Kellwood Co., 440 F.3d 96, 99 (2d Cir. 2006)). The Human Rights law provisions of the NYCHRL also "mirror the provisions" of the State law, and courts in New York have used the federal standards under Title VII when analyzing claims brought under the State and City laws. See Ferraro v. Kellwood Co., 440 F.3d at 99; see also Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1180 (2d Cir. 1992). Since both parties assess plaintiff's arguments in terms of the requirements of Title VII, the Court will do the same, except where the standards differ. (See discussion infra at 35-36).

VII.'" Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. at 753-54).

### 1. Quid Pro Quo Sexual Harassment

Generally, claims brought under Title VII for quid pro quo sexual harassment or hostile work environment are subject to the burden-shifting standard set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). "To succeed on a Title VII discrimination claim, the plaintiff must first offer . . . 'evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act.'" Okon v. Appia, No. 06 CV 6810, 2008 WL 2245431, at *8 (E.D.N.Y. May 29, 2008) (quoting Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 358 (1977)). "In producing such evidence, a plaintiff establishes a prima facie case, creating a presumption of discrimination which shifts the burden of production to the defendant. The defendant must then present a legitimate, non-discriminatory reason for the adverse employment action to rebut the presumption." Id.

If the defendant presents such a reason, the burden shifts back to the plaintiff to show that the reason was pretextual and "that discrimination was the real reason for the employment action." Id. (quoting Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2008)). A plaintiff may show pretext by "illuminating 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' that would raise doubt in the factfinder's mind that the employer did not act for those reasons." Bogdan v. N.Y. City Transit Auth., No. 02 Civ. 9587, 2005 WL 116182, at * (S.D.N.Y. May 17, 2005) (quoting Brierly v. Deer Park Union Free Sen. Dist., 59 F. Supp. 2d 275, 291 (E.D.N.Y. 2005)).

17

a. Prima Facie Case

Turning first to plaintiff's claim of quid pro quo sexual harassment, plaintiff alleges that she was subjected to "unwelcome sexual conduct by the defendant ADAMS, her boss, and that her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of her employment." (Opp.[13] at 7).

"*Quid pro quo* sexual harassment occurs when submission to or rejection of [improper or unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual." Richards v. N.Y.C. Dept. of Homeless Servs., No. 05 CV 5986, 2009 WL 700695, at *5 (E.D.N.Y. Mar. 15, 2009) (quoting Karibian v. Columbia Univ., 14 F.3d 773, 777 (2d Cir. 1994)); see also Mauro v. Orville, 259 A.D.2d 89, 697 N.Y.S.2d 704 (3d Dep't 1999). In holding that Title VII's prohibition on sex discrimination encompasses disparate treatment based on a sexual relationship, the Second Circuit has stated: "[V]oluntary, romantic relationships cannot form the basis of a sex discrimination suit under . . . Title VII." DeCintio v. Westchester County Med. Ctr., 807 F.2d 304, 308 (2d Cir. 1986); see also Kahn v. Objective Solutions, Intern., 86 F. Supp. 2d 377, 380 (S.D.N.Y. 2000). Thus, in Kahn v. Objective Solutions, International, the court held that the "gravamen of any sexual harassment claim is that the alleged sexual advances were 'unwelcome.'" 86 F. Supp. 2d at 380.

In addition to showing that she was subjected to unwelcome sexual advances, a plaintiff seeking to state a claim of quid pro quo sexual harassment, must also "demonstrate a tangible employment action, i.e., that an explicit . . . alteration[] in the terms or conditions of employment

---

[13]Citations to "Opp." refer to plaintiff's Memorandum of Law in Opposition, which was filed on December 7, 2010.

resulted from her refusal to submit to . . . sexual advances." Id. (internal quotations omitted).

"Tangible employment actions" include "a significant change in employment status, such as

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a

decision causing a significant change in benefits." Schiano v. Quality Payroll Sys., Inc., 445 F.3d

at 604.  An employee's mere feeling of punishment has been held not to be a sufficient basis for

finding a tangible action, see Marrero v. Goya of Puerto Rico, 304 F.3d 7 (1st Cir. 2002), nor is it

sufficient for an employee to suffer in silence.  See Matvia v. Bald Head Island Management,

Inc., 259 F.3d 261 (4th Cir. 2001).  "Simply put, the question is whether plaintiff's supervisor

'linked tangible benefits to the acceptance or rejection of sexual advances.'" Hamilton v. Bally

of Switz., No. 03 Civ. 5685, 2005 WL 1162450, at *4 (S.D.N.Y. May 17, 2005) (quoting

Karibian v. Columbia Univ., 14 F.3d at 778).

      Plaintiff must also prove that there was a causal connection between her reaction to the

unwelcome sexual advances and the adverse employment action.  See, e.g., Frederick v.

Sprint/United Management Co., 243 F.3d 1305 (11th Cir. 2001); Newton v. Cadwell Labs., 156

F.3d 880 (8th Cir. 1998).  In this regard, "the law of quid pro quo sexual harassment requires that

the alleged harasser is the supervisor who affects the conditions of employment." Heskin v.

Insite Advertising, Inc., No. 03 Civ. 2598, 2005 WL 407646, at *17 (S.D.N.Y. Feb. 22, 2005).

"'[I]f an alleged harasser possesses no authority to affect the benefits or privileges of the harassed

plaintiff's employment, plaintiff cannot sustain a Title VII claim of sexual harassment under the

*quid pro quo* theory.'" Id. (quoting Hernandez v. Jackson, Lewis, Schintzler & Krupman, 997 F.

Supp. 412, 417 (S.D.N.Y. 1998)).  A claim may survive, however, if an employee who is not the

actual supervisor acted as a de facto supervisor.  Id.

Here, Pacifica contends that plaintiff has not raised a triable issue of fact as to either prong; it argues that plaintiff cannot prove that the sexual conduct she complains of was unwelcome, or that her reaction to the sexual conduct was used as a basis for a tangible employment action. (Def.'s Mem. at 9-10). Pacifica also argues that Adams did not have the authority to affect the terms and conditions of her employment, and, therefore, the tangible employment action could not have been related to her refusal of Adams' advances.

i) <u>Unwelcome Sexual Advances</u>

Pacifica argues that "[w]here, as here, the Plaintiff admits that the sexual relationship with her superior was consensual, there can be no liability for the employer under Title VII" or the New York State and City Human Rights Laws. (Def.'s Mem.[14] at 9-10 (citing <u>Mauro v. Orville</u>, 259 A.D.2d 89, 697 N.Y.S.2d 704 (3d Dep't 1999))). In arguing that the relationship was consensual, Pacifica relies largely on the plaintiff's own deposition testimony. (<u>Id.</u> at 3-7). While conceding that Adams made advances toward plaintiff and that they had a sexual relationship, defendant points to plaintiff's testimony to argue that she never communicated to Adams that his advances were unwelcome. (<u>Id.</u> at 6-7). Indeed, at various points in her deposition testimony, plaintiff concedes that she was exploring the possibility of a romantic relationship with Adams. (<u>See</u> Pl.'s Dep. Tr.[15] at 56-57).

According to plaintiff's testimony, at her initial encounter with Adams on October 13,

---

[14]Citations to "Def.'s Mem." refer to the Memorandum of Law in Support of Defendant's Motion for Summary Judgment, filed on November 17, 2010.

[15]Citations to "Pl.'s Dep. Tr." refer to the transcript of plaintiff's deposition, which was taken on October 10, 2008.

2006, he squeezed her shoulder and asked her if she would consider being his assistant. (Id. at 27). She testified that she remembered "thinking, well that's a little overly friendly but whatever." (Id.) At the next meeting on November 6, he asked her to come to his office, where he again reiterated the idea of her becoming his assistant, but noted that he did not have the authority to do so; there was no money. (Id. at 33-34). Plaintiff claims that as she was leaving, he told her that he was "hopelessly attracted to her." (Id. at 34). According to her deposition, she told him, "well, I am not sure what to say," and then she left. (Id.).

Later that night, when Adams phoned plaintiff telling her he was "risking everything," she testified that although it was "somewhat flattering," she felt "uncomfortable." (Id. at 38). Nevertheless, on November 15, when he suggested that they could go to another city, "[a]way from prying eyes," to "take it slow," she testified that "I wanted to see again, going back, if he was sincere. If this was like a guy again out to f— me or was he genuinely interested in cultivating something further down the line." (Id. at 56). She testified that she told him that she did not want to sleep with him, and he said, "No, no you know that I respect what you want." (Id. at 57). Even when he told her he did not have time to "[c]ultivate a friendship," she agreed to go to his hotel room that night, "[t]o talk to him and to see, again I guess get to know him to see if this is someone who is gentlemanly, is sincere. Maybe to see if friendship was possible. . . ." (Id. at 59).

She testified that Adams gave her money to buy some liquor and food and that this mention of the hotel "was kind of, more of an order." (Id. at 60). However, she clarified by stating that it was "[n]ot so much the words," but "subtle body language, facial expression. Frowning tone," that it was "said in a way I just got the feeling if I didn't say all right. . . ." (Id. at

60, 61).

At the hotel, she had three or four glasses of vodka, and talked with Adams until 2:00 or 3:00 in the morning. (Id. at 66, 70-71). Since she did not want to spend "money on a cab," she agreed to spend the night, changing into a robe and getting into bed with Adams. (Id. at 71, 72). She testified that when he started to open her robe, her response was: "I was like, okay. I am a total idiot because he is not doing what I wanted at all . . . . Let me just try to suffer through this." (Id. at 74). She testified, "I might have tried to push him away . . . I really don't recall." (Id. at 75). She conceded that "He didn't rape me. I was inebriated. I was like, all right. You know, whatever. Let['s] just get this over with." (Id.) When he woke her in the morning to initiate sex, she testified that she did not really respond or protest: "I think at that point I felt there wasn't really anything to even say." (Id. at 84).

Although plaintiff's Memorandum of Law in Opposition fails to address defendant's argument that the alleged romantic advances of Adams were not unwelcome, in her Affidavit, plaintiff attempts to make clear that her relationship with Adams was not consensual, and "if something the defendant read in my deposition conveyed that impression, [it] is unfortunate and completely inaccurate." (Pl.'s Aff. ¶ 14). A search of the record reveals a number of contradictions between plaintiff's deposition testimony and her Affidavit. For example, in describing the meeting that took place on November 6, 2006, plaintiff testified at her deposition that, after Adams told plaintiff he was "hopelessly attracted" to her, she replied with the following: "Well, I am not sure what to say." (Tr.[16] at 33-35). Plaintiff testified that she then let

---

[16]Citations to "Tr." refer to the transcript of the deposition testimony of plaintiff, filed on November 17, 2010.

22

herself out of the room. (Id.) In contrast, plaintiff states in her affidavit that, instead of leaving the room, she "immediately informed Adams that I had no interest in becoming sexually involved with him, urging him to focus on his new job and suggesting we could just be friends." (Pl.'s Aff. ¶ 6).

More importantly, plaintiff's deposition testimony and Affidavit appear to contradict each other in describing the circumstances surrounding the interaction between plaintiff and Adams which allegedly occurred on the morning of November 16, 2006. During her deposition, plaintiff was asked whether she said anything to Adams when he initiated sexual intercourse. (Tr. at 84). Although she testified that, "I think at that point I felt there wasn't really anything to even say" (id.), in her affidavit, she states: "Adams violated me physically and emotionally[.] I hardly drink, and he had refilled my glass with vodka at least twice (that I knew of). He then easily ripped off my clothing and proceeded to start intercourse. I did not want to have sex with him and communicated this sentiment to him in clear, direct, unambiguous terms." (Pl.'s Aff. ¶ 8[17]). Although this statement in her Affidavit appears to contradict her deposition testimony, she did testify at her deposition that, when she and Adams engaged in oral sex later that morning, "I think I may have said, I really don't want to do this." (Tr. at 78-82).

In her affidavit, plaintiff asserts that after this encounter in the hotel, Adams "did not leave [her] alone." (Pl.'s Aff. ¶ 10). She claims to have told him that she "could no longer endure the oppressive conditions he had brought to my employment." (Id.) When he insisted that she accompany him to the train station, however, she concedes that she went with him,

---

[17]Plaintiff's affidavit is misnumbered, resulting in two separate paragraphs being labeled paragraph 8. Here, the Court refers to the second paragraph numbered 8.

Adams "gripping her hand" in the cab, and after eating lunch with him returned to work "3 hours later." (Id. ¶ 11). She also concedes that he "'suggested' that it would be 'VERY helpful'" if he could stay in her apartment, so she allowed him to do so. (Id. ¶ 12).

Although her affidavit protests that she had no romantic interest in Adams and that she made it clear that his advances were not welcome (id. ¶ 15), these statements seemingly contradict statements made in her deposition. It is well established that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Hayes v. N.Y. City Dep't of Corr., 84 F.3d 614, 619 (2d Cir. 1996). However, in this case, there are sufficient ambiguities in the deposition testimony and in plaintiff's description of events that the Court finds that there is a triable issue of fact as to whether Adams' subsequent sexual advances were unwelcome. In her deposition testimony, plaintiff indicated that after the encounter on November 15, she repeatedly told Adams that his advances were unwelcome. For instance, when Adams "may have alluded to oral sex" after a concert they attended together, plaintiff testified that she "completely slammed that down" and "pretty much knock[ed] that out." (Tr. at 109-10). In numerous other instances, plaintiff testified that she may have communicated to Adams that his advances were unwelcome. (See Tr. at 75, 80). Despite the apparent inconsistencies between plaintiff's deposition testimony and her Affidavit, it appears that plaintiff has alleged and testified that, at some point, she expressed to Adams that his advances were unwelcome.

Accordingly, the Court finds that there exist triable factual issues with respect to whether the advances were unwelcome.

ii. <u>Adverse Employment Action</u>

Pacifica also seeks to dismiss the quid pro quo claim on the grounds that plaintiff has not provided factual evidence to support her claim that her reaction to Adams' conduct "was used as the basis for tangible employment action." (Def.'s Mem. at 10). Pacifica's objections are twofold: 1) Pacifica argues that plaintiff has not provided evidence that the action taken against her was "tangible;" and 2) Pacifica argues that plaintiff has failed to show a causal connection between her reaction to Adams' alleged sexual advances and any adverse employment action taken against her.

Pacifica's first argument is that plaintiff has not provided evidence of a tangible employment action taken against her. Pacifica notes that "modification of plaintiff's shift to avoid contact with a supervisor fails to constitute tangible action." (Def.'s Mem. at 10). As plaintiff makes clear in her Opposition, however, she is alleging that Adams' "directive that the plaintiff stay away from the radio station constitutes discharge," either an "actual termination of the plaintiff's employment or . . . a constructive discharge." (Opp. at 8).


a) <u>Constructive Discharge</u>

Plaintiffs alleging quid pro quo sexual harassment must show a "tangible" employment action. <u>See, e.g.</u>, <u>Schiano v. Quality Payroll Sys., Inc.</u>, 445 F.3d at 604. Courts in other circuits have held that a constructive discharge is not a sufficiently tangible employment action to serve as the basis for a quid pro quo claim. For example, the Tenth Circuit has held that "[b]y definition, a claim of *quid pro quo* sexual harassment must be supported by a negative employment action that is separate and distinct from the underlying sexual misconduct (*i.e.*, a

25

demotion) . . . [W]hile plaintiff may assert a constructive discharge claim as part of her hostile

work environment claim . . . she cannot survive summary judgment on her *quid pro quo* claim

based on a constructive discharge theory." Rogers v. City County Health Dep't of Okla. County,

30 Fed. Appx. 883, 888 n.2 (10th Cir. 2002). The Third Circuit rejected a similar attempt in

Bonenberger v. Plymouth Township, finding that although the plaintiff "has alleged facts

sufficient to survive summary judgment on her claim of constructive discharge due to hostile

work environment, this alone is not enough to make out a claim for *quid pro quo* harassment."

132 F.3d 20, 28 (3d Cir. 1997).

In Burlington Industries, Inc. v. Ellerth, the Supreme Court also appeared to reject the

contention that constructive discharge constitutes a tangible employment action in the context of

a Title VII action. 524 U.S. 742. In Ellerth, the plaintiff had "alleged that she had been

constructively discharged as a result of sexual harassment by her supervisor. In remanding the

case for a determination of whether the employer could make out an affirmative defense, the

Supreme Court noted that 'Ellerth has not alleged she suffered a tangible employment action at

the hands of [her supervisor].'" Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 295 (2d

Cir. 1999), overruled on other grounds (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. at

766). Although the Supreme Court made this decision in the context of determining whether the

employer had an available affirmative defense, the Court sees no reason why the definition of

"tangible employment action" should be different in proving a prima facie case of sexual

harassment.

In support of her contention that constructive discharge may serve as the basis for a claim

of quid pro quo sexual harassment, plaintiff cites Jin v. Metropolitan Life Insurance Co., 295

26

F.3d 335 (2d Cir. 2002). (Opp. at 8). This case, however, is distinguishable in that the plaintiff in Jin presented evidence that her supervisor "ordered her to submit to demeaning sexual acts, explicitly threatened to fire her if she did not submit, and then allowed her to keep her job after she submitted." Jin v. Metropolitan Life Ins. Co., 295 F.3d at 345. Unlike Jin, which involved allegations of "coerced submission to sexual abuse" explicitly linked to the plaintiff's job, plaintiff has not made similar allegations. Nowhere in any of her submissions does plaintiff allege that Adams ever directly or indirectly told her that she would be fired if she did not respond to his advances.

Even if constructive discharge could serve as the basis for a quid pro quo claim, plaintiff does not present sufficient facts to establish that Adams' behavior caused her to quit her job. To establish a claim for constructive discharge, "a plaintiff must show that the employer 'intentionally creates a work atmosphere so intolerable that [the employee] is forced to quit involuntarily.'" Miller v. Praxair, Inc., 408 Fed. Appx. 408, 409 (2d Cir. 2010) (quoting Terry v. Ashcroft, 336 F.3d 128, 151-52 (2d Cir. 2003)). Plaintiff appears to allege only that Adams' "directive that the plaintiff stay away from the radio station constitutes discharge," but plaintiff does not provide enough evidence to conclude that she was effectively discharged. For instance, plaintiff does not allege that staying away from the station during the day made it impossible for her to perform the duties of her position, or that Adams even had the authority to change her schedule.

Notwithstanding the above infirmities, plaintiff's constructive discharge claim must fail because she fails to allege in her Complaint, or in her Affidavit, that she stopped working at the radio station as a direct result of this directive. In the absence of evidence demonstrating that

27

Adams had the authority to and did in fact issue a directive that caused her to quit her job, plaintiff cannot maintain an action for constructive discharge, either as a separate claim or as an element of quid pro quo sexual harassment.

Accordingly, plaintiff's claim of constructive discharge cannot serve as the basis for a claim of quid pro quo sexual harassment.


### b) Reduction in Hours

Even though plaintiff has failed to demonstrate that she left her employment as a result of Adams' conduct, she could still demonstrate that she suffered an adverse employment action when her hours and her pay were reduced. Pacifica notes that plaintiff has not alleged in the Complaint that the reduction in hours was caused by a rejection of Adams' advances, nor does she make any such allegation in her Affidavit.[18] Indeed, in her papers in opposition to the motion, plaintiff fails to even address Pacifica's argument that plaintiff has provided no evidence to establish a causal relationship between her rejection of Adams and the reduction in her hours.


### iii. Adams as Supervisor

However, even if plaintiff could show that the reduction in her hours was related to Adams' conduct, Pacifica argues that the change in plaintiff's schedule was "not a result [of] any

---

[18]The inattentiveness of plaintiff's counsel again forces the Court to search the record for facts which support plaintiff's case. (See discussion supra at 10-11). In this circumstance, however, not only did counsel fail to supply the Court with supporting facts; counsel failed to even formulate an argument in response to the defendants' assertions.

action on the part of her supervisor ADAMS, who had not [*sic*] authority to do so, but on the direction of WBAI's Director of Fiscal Department . . . ." (Def.'s Mem. at 11). "The law of quid pro quo sexual harassment requires that the alleged harasser is the supervisor who affects the conditions of employment." Heskin v. Insite Advertising, 2005 WL 407646, at *17. A claim may survive, however, if an employee who is not the actual supervisor acted as a de facto supervisor. Id. "[A] *quid pro quo* claim of harassment can rest on an alleged harasser's authority to influence an adverse employment decision, if that influence is so significant that the harasser may be deemed the *de facto* decisionmaker." Hernandez v. Jackson, Lewis, Schnitzler, & Krupman, 997 F. Supp. at 417.

In support of its argument that Adams had no authority to direct a change in plaintiff's schedule, Pacifica cites the Declaration of Indra Hardat, the Director of the Fiscal Department for WBAI. Hardat states that she has held this position since 2006, and that "Robert Scott Adams, the Interim General Manager between November 2006 and early 2008[,] did not have the authority to reduce or increase the hours that part-time workers at WBAI could work." (Hardat Decl.[19] ¶ 3). She further states that "I was the only person at WBAI in 2007 with the power to determine the number of hours part-time employees at WBAI could work." (Id.) "Any increase or reduction in hours for Andrea Clarke was solely my prerogative, and was not and could not be done by Robert Scott Adams for any purpose." (Id. ¶ 4).

Plaintiff submits no evidence contradicting this assertion. Plaintiff does state in her affidavit that Adams told her he was "sent by Pacifica to clean house," earning the nickname

---

[19]Citations to "Hadrat Decl." refer to the Declaration of Indra Hadrat, filed on November 17, 2010, as an exhibit to Pacifica's Motion for Summary Judgment.

"'hatchet man,'" and she claims that she "endured Adams' unwelcome advances for fear that he would not only terminate the per diem position I held at WBAI, but my radio show which I created 8 years ago and which gave me great joy and satisfaction." (Pl.'s Aff. ¶ 14). However, plaintiff does not claim that Adams had the power to change the hours she worked, nor does she claim that Adams in fact influenced the decision to change her hours. (Id. ¶ 14). Indeed, nowhere does she claim that Adams ever explicitly threatened to fire her or reduce her hours. (See Pl.'s Dep. Tr. at 120). To the contrary, she testified at her deposition that when she asked Adams to intervene on her behalf, Adams told her that, with respect to her hours, "there's nothing I can do about it. I have no power in this." (Id. at 117, 122).

Although plaintiff may have presented a triable issue of fact as to whether Adams's sexual advances were unwelcome, she has failed to allege or offer any factual basis suggesting that Adams had the authority to impose the adverse employment action she allegedly suffered. Indeed, plaintiff has not alleged that Adams did in fact influence the decision to reduce the hours she worked or that her reaction to his advances had anything to do with the reduction in her hours. Accordingly, plaintiff has not stated a prima facie case for quid pro quo harassment, and has therefore failed to meet her burden under McDonnell Douglas.

### b. Defendant's Legitimate Non-discriminatory Justification

Even if plaintiff were able to make out a prima facie case of quid pro quo discrimination, further analysis under McDonnell Douglas would show that she is unable to meet her burden of showing that defendant's proffered non-discriminatory justification is pretextual. Pacifica contends that the reduction in plaintiff's hours was not the result of quid pro quo sexual

30

harassment. Instead, Pacifica asserts that the reduction in hours was "based upon budgetary needs, not Plaintiff's rejection of ADAM's [*sic*] advances." (Def.'s Mem. at 11). "The Second Circuit and the New York Court of Appeals have held that a reduction in force caused by economic conditions can be an adequate defense to a discriminatory discharge claim." Heskin v. Insite Advertising, 2005 WL 407646, at *18.

In support of its claim that plaintiff's part-time hours were reduced for legitimate budgetary reasons, Pacifica submitted the Declaration of Ahmad Anderson, Human Resource Director of Pacifica. According to Mr. Anderson, plaintiff was employed by WBAI "on a part-time as needed basis to process complaints in the membership office, as a board operator, to record 'tallys' regarding pledge donations during quarterly fund drives." (Anderson Decl. ¶ 2). Her hours would range from 10 to 30 hours per week "on an 'as needed' basis depending on WBAI's budget and the results of the WBAI fund drive." (Id.) Mr. Anderson further states that the decision to reduce plaintiff's part-time hours was the duty of Ms. Hardat "based on the budgetary needs of the Premiums Department." (Id. ¶ 9). This corroborates Ms. Hardat's Declaration in which she states that "in late January, 2007, I was not able to give any part-time workers at WBAI any additional hours due to budgetary problems resulting from poor revenues in the fund drive." (Hardat Decl. ¶ 4).

Based on these sworn statements, defendant has proffered a non-discriminatory justification sufficient to meet its burden under McDonnell Douglas.

c. <u>Pretext</u>

Since defendant has offered a legitimate, non-discriminatory justification for reducing plaintiff's hours, the burden shifts back to plaintiff to show that the proffered reason is pretextual. Plaintiff, however, has failed to address the issue of pretext. Accordingly, the Court has searched the record to determine if plaintiff has submitted sufficient facts that could support an inference of pretext.

First, plaintiff does not appear to dispute defendant's proffered non-discriminatory justification, nor does she provide any citations to evidence suggesting that the justification is pretextual. However, it could be argued that the temporal proximity between plaintiff's final rejection of Adams and the reduction in her hours creates a factual issue for a jury to resolve. "While the Second Circuit has recognized that temporal proximity can be valid evidence of retaliation . . . this Court has not found cases addressing whether temporal proximity is evidence of pretext for quid pro quo discrimination." <u>Heskin v. Insite Advertising, Inc.</u>, 2005 WL 407646, at *19; <u>see also</u> <u>Carter v. N.Y.</u>, 310 F. Supp. 2d 468, 475 n.5 (N.D.N.Y. 2004) (finding that "[t]he issue of temporal proximity almost never arises in the context of a *quid pro quo* claim . . . ."). However, the Court in <u>Heskin</u> found that temporal proximity, when combined with other evidence that cast doubt on the defendant's proffered justification, could serve as evidence of pretext. In this case, plaintiff has not articulated the argument that the temporal proximity or any other evidence casts doubt on the nondiscriminatory rationale advanced by defendant.

Second, plaintiff makes only conclusory, implicit allegations that Adams had any influence over the decision to reduce her hours. As discussed <u>supra</u> at 9, the Complaint alleges only that "on November 30, 2006, plaintiff's supervisor informed her that, henceforth, her work

32

hours would be reduced by half, ergo, her pay would be cut in half. ADAMS disavowed to plaintiff that he had given the order to, indeed, had known anything about [changing plaintiff's work schedule], but he would look into it." (Compl. ¶ 52). At no point in the Complaint does plaintiff suggest that Adams used his position to reduce the number of hours plaintiff could work, or that he had such authority; indeed, as noted earlier, when plaintiff asked about her employment status, in December 6, 2006, she concedes that "ADAMS responded angrily that there was nothing he could do about it, and hung up." (Id. ¶ 53). Further, none of the evidence proffered by plaintiff would support such a conclusion.

Even taking the facts as alleged by plaintiff, there is no allegation that Adams was involved, either formally or informally, in the decision to reduce her hours. Thus, the Court finds that plaintiff has failed to meet her burden under McDonnell Douglas to present sufficient facts from which a jury could infer that the defendant's nondiscriminatory explanation for its conduct was pretextual.

In summary, based on an independent review of the record, the Court finds that even if plaintiff's alleged facts are accepted as true, plaintiff has failed to establish sufficient facts to support a prima facie case of quid pro quo sexual harassment, and even if she had, plaintiff has not presented any evidence to show that defendant's proffered explanation for the reduction in her hours was pretextual. Thus, the Court finds that defendant has sustained its burden of showing that there are no material facts in dispute that, even if decided in plaintiff's favor, would support her claim of quid pro quo sexual harassment. Accordingly, the Court grants defendant's motion for summary judgment with respect to plaintiff's claim of quid pro quo sexual harassment.

## 2. Hostile Work Environment

Plaintiff has also claimed a violation of Title VII based on allegations of a hostile work environment. "To establish a hostile work environment claim under Title VII, 'a plaintiff must demonstrate that (1) he subjectively perceived the environment to be abusive; (2) the conduct alleged objectively created an environment that a reasonable person would find hostile or abusive; and (3) that the work environment was abusive to employees because of their race, gender, religion, or national origin.'" Kramsky v. Chetrit Group, LLC, Nos. 10 Civ. 2638, 10 Civ. 9458, 2011 WL 2326920, at *7 (S.D.N.Y. June 13, 2011) (quoting Cunningham v. N.Y. State Dep't of Labor, 326 Fed. Appx. 617, 620 (2d Cir. 2009)).

A plaintiff bringing a claim for a hostile work environment must also show "a series of sufficiently continuous and concerted incidents that altered the conditions of his or her working environment; however, even a single incident may suffice if the incident was 'extraordinarily severe.'" Richards v. N.Y.C. Dep't of Homeless Servs., 2009 WL 700695, at *6 (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). However, one "extraordinarily severe" incident may serve as the basis for a hostile work environment claim. Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (holding that "the plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment").

To determine whether the conduct is severe or pervasive enough to constitute an

34

objectively hostile work environment, the Court most look to the "totality of the circumstances."

Patterson v. County of Oneida, N.Y., 375 F.3d 206, 227 (2d Cir. 2004). When assessing the

totality of the circumstances, courts consider the following: "(1) the frequency of the

discriminatory conduct; (2) its severity; (3) whether it is threatening and humiliating, or a mere

offensive utterance; and (4) whether it unreasonably interferes with an employee's work

performance." Lamar v. Inst. for Family Health, No. 09 CV 1154, 2011 WL 2432925, at *10

(N.D.N.Y. June 16, 2011) (citing Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007)). The

question "is a 'mixed question of law and fact,' and summary judgment is only appropriate

'where application of the law to those undisputed facts will reasonably support only one ultimate

conclusion.'" Richards v. N.Y.C. Dep't of Homeless Servs., 2009 WL 700695, at *7 (quoting

Richardson v. N.Y. State Dep't of Correctional Serv., 180 F.3d 426, 437 (2d Cir. 1999)). The

plaintiff must also show "a specific basis for imputing the conduct creating the hostile work

environment to the employer."[20] Feingold v. New York, 366 F.3d 138, 150 (2d Cir. 2004) (citing

Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002)).

"Employment discrimination claims brought under the NYSHRL are analyzed identically

to claims under the ADEA and Title VII." Brennan v. Metropolitan Opera Ass'n, Inc., 192 F.3d

310, 317 n.2 (2d Cir. 1999). Similarly, the elements of a claim for hostile work environment

---

[20]"When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that 'the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (quoting Karibian v. Columbia Univ., 14 F.3d at 780). Defendant has not raised this issue in its motion for summary judgment, but plaintiff appears to have provided a sufficient basis for imputing the hostile work environment to Pacifica. Plaintiff appears to contend that her complaint to Pacifica regarding sexual harassment was handled unreasonably in that Gregory Guma, the Executive Director of Pacifica, relied primarily on a statement provided by Adams instead of crediting plaintiff's complaint. (Opp. at 16-17).

under the New York City Administrative Code are substantially the same as under Title VII and the NYSHRL. One difference is that "claims under the city code do not require the harassment leading to the hostile work environment to be as 'severe or pervasive' as that required under Title VII." Kramsky v. Chetrit Group, LLC, 2011 WL 2326920, at *8 (citing Williams v. N.Y.C. Hous. Auth., 61 A.D.3d 62, 76, 872 N.Y.S.2d 27, 38 (1st Dep't 2009)). However, courts in New York have noted that "the NYCHRL [is] not a 'general civility code' and that 'petty slights and trivial inconveniences' [are] still non-actionable under the law." Mihalik v. Credit Agricole Cheuvreux North America, Inc., No. 09 Civ. 1251, 2011 WL 3586060, at *9 (S.D.N.Y. July 29, 2011) (quoting Williams v. New York City Hous. Auth., 61 A.D.3d at 78-80, 872 N.Y.S.2d at 40-41).

Pacifica contends that plaintiff cannot show that the alleged harassment was sufficiently pervasive to constitute a hostile work environment. (Def.'s Mem. at 13). Specifically, it argues that "there is no proof that the few incidents alleged by Plaintiff occurred either in concert or with a regularity that can reasonably be termed pervasive." (Id.) Pacifica also argues that the alleged harassment is not sufficiently severe to overcome the harassment's lack of pervasiveness. (Id.)

In response, plaintiff cites a number of instances which, taken together, show that she was subjected to a hostile work environment. First, plaintiff states that Adams' first visit to the WBAI on October 13, 2006, although "not part of the plaintiff's cause of action . . . is mentioned to establish that the pattern of harassment started on the day ADAMS met CLARKE for the first time." (Opp. at 11). At this first meeting, Adams allegedly squeezed plaintiff's shoulder and asked her to be his assistant. (Id. at 2). The next incident cited by plaintiff is the November 6,

2006 meeting at which Adams allegedly told plaintiff that he was "hopelessly attracted" to her, as well as his phone call to her later that night. (Opp. at 12; Pl.'s Aff. ¶ 6; Pl.'s Dep. Tr. at 34).

According to plaintiff, Adams "paid numerous visits to plaintiff's office, which was out of his way, for no other reason than to pressure the plaintiff to become romantically and/or sexually involved with him."[21] (Opp. at 12; see Pl.'s Aff. ¶ 8; Pl.'s Dep. Tr. at 40-41). Plaintiff also claims that, throughout his time at WBAI, Adams "openly pushed his pornography to anyone and everyone, becoming visibly insulted if you refused." (Id. ¶ 5; see Pl.'s Dep. Tr. at 53). However, the only time she claims that he attempted to show it to her was outside of the workplace, during the time that he was staying in her apartment. (See discussion infra at 38).

Plaintiff alleges that on November 15, 2006, Adams approached her, gave her $50, and "demanded that she visit him at the hotel where he was staying . . . ." (Opp. at 12; see Pl.'s Aff. ¶¶ 9-10). After plaintiff's hours were reduced and plaintiff contacted Adams, plaintiff alleges that Adams "caution[ed] her, . . . 'don't even think about filing a sexual harassment charge against me . . . .'" (Opp. at 12; see Pl.'s Aff. ¶ 13). According to plaintiff, after her sexual encounter with Adams, she "confronted ADAMS and insisted that he leave her alone," after which Adams "demanded that CLARKE leave her desk and accompany him in the taxicab to

---

[21]"[A] plaintiff, to prevail [on a hostile work environment claim], need not recount each and every instance of abuse to show pervasiveness." Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 119-20 (2d Cir. 2010). In Pucino, the Second Circuit held that that a jury could reasonably "credit [the plaintiff's] general allegations of constant abuse . . . even in the absence of specific details about each incident." Pucino v. Verizon Wireless Commc'ns, 618 F.3d at 120. In so holding, the Court of Appeals cited Torres v. Pisano, 116 F.3d 625 (2d Cir. 1997), in which "a plaintiff testified that a supervisor 'constantly harassed her--so often that she lost count--but that she could recall the exact dates and circumstances of only a few incidences of harassment," and plaintiff's claim for hostile work environment survived summary judgment. Pucino v. Verizon Wireless Commc'ns, 618 F.3d at 120.

Penn Station so he could talk her out of ending 'the relationship.'" (Opp. at 7).

Plaintiff also refers to a number of incidents that occurred outside the workplace. For instance, plaintiff refers to the sexual encounter between plaintiff and Adams which took place in the hotel on November 15 and 16 as incidents of harassment supporting her hostile work environment claim. In addition, plaintiff claims that "while a house guest of CLARKE, ADAMS pressured CLARKE to read his erotic writings." (Opp. at 13). "As a general proposition, employers are not responsible under Title VII for hostile sexual acts resulting from nonwork-related, off-duty interactions between co-employees." Feliciano v. Alpha Sector, Inc., No. 00 Civ. 9309, 2002 WL 1492139, at *8 (S.D.N.Y. July 12, 2002) (quoting P. v. Delta Air Lines, Inc., 102 F. Supp. 2d 132, 138 (E.D.N.Y. 2008), vacated on other grounds by Ferry v. Delta Air Lines, Inc., 277 F.3d 128 (2d Cir. 2001)). Adams' hotel room, like plaintiff's apartment, cannot rightly be considered part of the "work environment" maintained by Pacifica. Accordingly, the Court does not consider the alleged incidents of harassment which occurred outside the workplace.

Taking all of the alleged incidents in combination, plaintiff contends that "ADAMS was unrelenting in his pursuit and just would not take 'no' for an answer . . . . In street vernacular, ADAMS was all over CLARKE like a rash." (Opp. at 14). In other words, plaintiff argues, her harassment was "continuous and concerted," and "[t]he evidence will show that ADAMS, with unflagging regularity, pressured the plaintiff to be involved romantically and sexually with him." (Id.)

However, when considered in their entirety, the events described by plaintiff that occurred in the workplace fail to rise to the level of severity and pervasiveness necessary to

sustain a claim for hostile work environment. Plaintiff's claim essentially rests on the following: 1) alleged workplace flirtation over the course of a month; 2) the November 15, 2006 "demand" that plaintiff visit Adams in his hotel; and 3) the "demand" that plaintiff accompany Adams to discuss the ending of their "relationship." These incidents are not sufficiently severe or pervasive to sustain a claim of hostile work environment.

The facts of this case are similar to those of <u>Mihalik v. Credit Agricole Cheuvreux North America, Inc.</u>, a case involving a hostile work environment claim based on plaintiff's testimony "that [the defendant] showed her pornographic images, made objectifying comments, and initiated sexual overtures." 2011 WL 3586060, at *10. Specifically, the harasser in <u>Mihalik</u> "showed [plaintiff] pornography once or twice a month from July through December 2007," "commented [that plaintiff] looked 'very sexy' once a week and made other sporadic comments from July through December 2007," and made "one remark suggesting that [plaintiff] was promiscuous and one question about whether she enjoyed a particular sexual position." <u>Id.</u> The district court found that while the comments were "boorish and offensive," they were "not so grave or objectionable that they would have altered the conditions of [plaintiff's] employment." <u>Id.</u> Likewise, the court found that the instances in which the defendant showed pornography to the plaintiff were "properly categorized as 'trivial inconveniences.'" <u>Id.</u>

Other similar cases have also resulted in courts granting summary judgment against plaintiffs. <u>See, e.g.</u>, <u>McArdle v. Arms Acres, Inc.</u>, No. 03 Civ. 5721, 2009 WL 755287, at *15 n.22 (S.D.N.Y. Mar. 23, 2009) (collecting cases); <u>Feliciano v. Alpha Sector, Inc.</u>, No. 00 Civ. 9309, 2002 WL 1492139, at *2 (S.D.N.Y. July 12, 2002) (alleged harasser briefly dated plaintiff, attempted to hug her at work, and told her she was beautiful); <u>O'Dell v. Trans World Entm't</u>

<u>Corp.</u>, 153 F. Supp. 2d 378, 386 (S.D.N.Y. 2001) (plaintiff and alleged harasser went on several dates; harasser "repeatedly asked her out," "made comments about her appearance, sent her e-mails professing his love for her, called her at work and at home, invited her to tour New York City with him, gave her three gifts, and played her a song she found offensive").

Upon reviewing the totality of the circumstances, the Court finds that a jury could not reasonably conclude that plaintiff was subjected to an objectively hostile work environment. The incidents alleged by plaintiff are not sufficiently severe or pervasive to support such a claim. Accordingly, defendant has met its burden in showing that plaintiff has failed to allege facts sufficient to show that a hostile work environment existed.

CONCLUSION

Defendant's motion for summary judgment is granted. The Court will hold a status conference on September 29, 2011 at 2:00 .

**SO ORDERED**.

Dated: Brooklyn, New York
        September 16, 2011

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York